## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **FEDERAL INSURANCE COMPANY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **CASE NO. _____** |
| | : | |
| **AMERITAS LIFE INSURANCE CORP.;** | : | |
| **AMERITAS INVESTMENT CORP.;** | : | |
| **UNION CENTRAL LIFE INSURANCE** | : | |
| **COMPANY; AND AMERITAS** | : | |
| **HOLDING COMPANY.** | : | |
| | : | |
| **Defendants** | | |

## DECLARATORY JUDGMENT COMPLAINT

Pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201, Federal Insurance Company ("Federal") brings this declaratory judgment action against Ameritas Life Insurance Corp., Ameritas Investment Corp., Union Central Life Insurance Company, and Ameritas Holding Company (collectively "Ameritas") seeking a declaration that Ameritas' financial institution bond does not cover amounts incurred to defend and settle a third-party liability arising from the alleged dishonesty of Dee Allen Randall.  In support thereof, Federal alleges as follows:

### INTRODUCTION

1.      Federal issued a financial institution bond (identified as Policy No. 81952300 and referred to herein as the "Bond") to Ameritas, a true and correct copy of which is attached hereto as Exhibit 1.  The Bond is not a liability policy.  It is "direct insurance" whereby "the insurer is liable only in the event of a loss sustained by the insured."  *Foxley Cattle Co. v. Bank of Mead*, 244 N.W.2d 205, 208 (Neb. 1976).  It "does not insure . . . against the consequences of [the

1

insured's] own torts" and "legal liability of a named insured to a third party does not create legal liability of the insurer under a blanket bond to such third party." *Omaha Bank for Cooperatives v. Aetna Casualty & Surety Co.*, 301 N.W.2d 564, 569, 567 (Neb. 1981); *see also KAMI Kountry v. U.S. Fid. & Guar. Co.*, 208 N.W.2d 254, 256 (Neb. 1973).

2.      Federal and Ameritas previously litigated this issue in this Court in *Ameritas Life Insurance Corp. v. Federal Insurance Company*, 16-CV-3006 (D. Neb.), referred to herein as *Ameritas I*. *Ameritas I* involved a claim for amounts incurred defending and settling third-party claims in which investors alleged that Jason Muskey defrauded them. This Court entered summary judgment in favor of Federal in *Ameritas I*, agreeing with Federal that the Bond does not cover amounts incurred to settle liability to a third party, even if that claim alleges dishonesty by one of Ameritas' employees. A true and correct copy of the decision in *Ameritas I* is attached hereto as Exhibit 2.

3.      Despite the decision in *Ameritas I*, Ameritas submitted a second claim to Federal and again demanded that Federal reimburse it for amounts incurred to settle its alleged liability to third parties.  As in *Ameritas I*, Ameritas again seeks coverage under the Bond for amounts paid to defend and settle its alleged tort liability to investors allegedly defrauded by Dee Allen Randall.   Although *Ameritas I* resolved the scope of coverage under the Bond and precludes coverage for Ameritas' current claim, Ameritas' continued prosecution of that claim reflects its disagreement about coverage under the Bond. Federal and Ameritas thus have a dispute ripe for resolution through a declaratory judgment.

4.      Consistent with *Foxley, Omaha Bank, KAMI* and the decision in *Ameritas I*, Federal seeks a declaration that Ameritas' insurance claim is not covered under the Bond, that Federal does not owe any obligation to reimburse Ameritas for amounts incurred to defend and

settle its civil liability, and that the settlement of such a liability represents an indirect loss outside the Bond's scope of coverage.

## PARTIES, JURISDICTION AND VENUE

5.     Federal Insurance Company ("Federal") is a corporation organized under Indiana law that maintains its principal place of business in New Jersey.

6.     Ameritas Life Insurance Corp. ("ALIC") is a corporation organized under Nebraska law that maintains its principal place of business in Nebraska. ALIC is a Nebraska life insurance company licensed to sell insurance products in all fifty (50) states of the United States of America.  Prior to the submission of its insurance claim and by July 2014, ALIC merged with Union Central Life Insurance Company ("Union Central").  Thereafter, Union Central became part of ALIC and ALIC assumed the liabilities of Union Central.

7.     Ameritas Investment Corp. ("AIC") is a corporation organized under Nebraska law that maintains its principal place of business in Nebraska. AIC is a Nebraska company licensed to sell securities products in all fifty (50) states of the United States of America.

8.     Ameritas Holding Company is a corporation organized under Nebraska law that maintains its principal place of business in Nebraska.

9.     The Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between Plaintiff and Defendants and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

10.     Venue is proper in this district and division pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to Plaintiff's suit for declaratory judgment occurred in this district.

11.     The Court has personal jurisdiction over Defendants by virtue of their contacts

with Nebraska.

12.    This Court also has jurisdiction over this declaratory judgment action pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. §2201.  An actual and substantial controversy exists between the parties regarding a series of issues, including but not limited to whether Ameritas can pursue a claim against Federal.

**MUSKEY INSURANCE CLAIM**

13.    Jason Muskey ("Muskey") was a life insurance agent and financial advisor, operating through his company, Muskey Financial Services ("Muskey Financial").

14.    Third parties ("Muskey Investors") alleged that Muskey defrauded and embezzled money from them by fraudulently inducing them to send him money for purported investments. Muskey induced the customers to (a) withdraw money from investments at Ameritas; (b) withdraw money held at another financial institution; or (c) issue checks drawn on their personal checking accounts to Muskey. Rather than invest his customers' funds, Muskey misappropriated the money for his own use.

15.    The Muskey Investors demanded that Ameritas reimburse them for their loss for which Ameritas bore civil liability.  Ameritas settled with the Muskey Investors and thereafter sought coverage under the Bond (the "Muskey Claim"). Federal declined coverage for the Muskey Claim on the basis that the Bond does not cover amounts incurred to defend and settle Ameritas' alleged liability to third parties defrauded by Muskey, even if Ameritas suffered that alleged liability due to employee dishonesty.

16.    Ameritas disagreed with Federal's declination of coverage and filed a breach of contract and bad faith action against Federal in the United States District Court for the District of Nebraska. On October 25, 2017, Judge John M. Gerrard issued an order granting summary

judgment in favor of Federal in *Ameritas I*. A copy of the summary judgment decision is attached hereto as Exhibit 2.   That decision conclusively held that the Bond does not cover amounts incurred to defend and settle civil liability, even though Ameritas incurred the alleged civil liability due to alleged employee dishonesty.

17.     Ameritas argued in *Ameritas I* that settlement of its alleged liability qualified as a direct loss covered under Insuring Agreement 1 of the Bond.   Judge Gerrard rejected that argument and held that "'direct' as used in the fidelity bond is unambiguous, and requires a more immediate nexus than Ameritas urges here."  Because Ameritas did not immediately suffer a loss as a result of Muskey's alleged dishonesty and suffered a loss only after it settled with the Muskey Investors, Judge Gerrard held that Ameritas did not suffer a direct loss resulting from Muskey's alleged dishonesty and could not recover under the Bond.

18.     Ameritas argued in *Ameritas I* that the Court should adopt a proximate cause analysis, but Judge Gerrard declined to do so and held that application of a proximate cause analysis did not substantiate Ameritas' claim: "In any event, the Court agrees with Federal that under *KAMI* and *Omaha Bank*, coverage would be foreclosed *even if* the Court were to adopt the 'immediate or proximate' rationale noted above. Indeed, those cases clearly suggest that losses resulting from third party tort claims are necessarily *indirect*, and thus precluded under the terms of the bond."

## RANDALL INSURANCE CLAIM

19.     From approximately 1996 until 2011, Dee Allen Randall ("Randall") owned and operated numerous Utah-based entities that together formed the "Horizon Financial Group of Companies" or the "Horizon Group of Companies" ("Horizon Group"). These companies included Horizon Financial and Insurance Agency ("HFI"), Independent Financial & Investment

("IFI") and Horizon Auto Funding ("HAF"). HFI sold life insurance products and was a general

agent for Union Central in Utah beginning in February 2000.

20.     On October 5, 2011, The Salt Lake Tribune published an article about Randall

stating that:

> Dee Allen Randall, the owner of Horizon Mortgage & Investment, Horizon
> Financial and Insurance Group and Horizon Auto Funding, is suspected by a U.S.
> bankruptcy official of running a Ponzi scheme in which monies from new
> investors were used to pay earlier investors to make it appear the businesses were
> profitable.
>
> Randall had promised returns of up to 14 percent and to safeguard retirement
> monies with investments in real estate, auto leases or through insurance products.
>
> Ogden attorney Steven Bailey, who represents several investors, said Randall has
> said in court he took in about $65 million from about 700 investors.

(*Miller v. Union Central Life Ins. Co.*, Case No. 2:14-cv-00575-JNP, Dkt. 120-6). The article

also disclosed that Randall was under investigation by state regulators. (*Id.*)

21.     Thereafter, Union Central's attorneys wrote to Randall, requesting "information,

an explanation and documentation as it relates to the recent media attention and news articles

concerning yourself and your business." On November 9, 2011, Union Central terminated

Randall as its producer and HFI as its general agent, effective October 12, 2011. (October 12,

2011 is the date on which Randall's companies entered into Chapter 11 bankruptcy.) Ameritas

did not submit a claim under the Bond in 2011 and does not allege that it incurred a loss during

the time in which Randall and HFI sold Union Central insurance products. Instead, Ameritas

waited until August 5, 2014 to submit notice of claim under the Bond alleging that Randall

engaged in dishonesty and that it might incur a future liability.  Federal timely acknowledged

notice of the claim and on August 13, 2014, requested that Ameritas submit a proof of loss

documenting its claim.

6

22.     Thereafter, Ameritas notified Federal that the bankruptcy trustee, Gil A. Miller, (the "Trustee"), in his capacity as the Trustee of the Randall Victims Private Actions Trust (the "Victims PAT") filed a complaint against Union Central Life Insurance Company, Ameritas Life Insurance Corp., Ameritas Life Insurance Corp. of New York, and Acacia Life Insurance Company (*Miller v. Union Central Life Insurance Company*, Case No. 14-cv-00575, the "Miller Lawsuit"). A true and correct copy of the Complaint filed in the Miller Lawsuit is attached hereto as Exhibit 3.

23.     Acting on behalf of the beneficiaries of the Victims PAT, the Miller Lawsuit alleged that Dee Randall operated a Ponzi scheme involving the sale of worthless promissory notes issued through the various entities that he owned or controlled. Marketing these notes through a pattern and practice of deceit, fraudulent misrepresentations, and misleading omissions, Randall allegedly claimed that the "guaranteed" interest payments on the notes would be sufficient to cover the premiums on the expensive, and often unsuitable, insurance policies and annuities issued by Union Central.

24.     As a result of this alleged fraud, hundreds of victims allegedly lost tens of millions of dollars. Ameritas did not invest in Randall's alleged Ponzi scheme, allege that Randall embezzled its funds or otherwise claim that Randall fraudulently induced Ameritas to part with any money owned or held by Ameritas.

25.     The Miller Lawsuit sought recovery based upon negligent hiring, negligent supervision, negligent retention, the Utah Uniform Securities Act, and unjust enrichment. The Miller Lawsuit did not allege that Randall stole from Ameritas, but rather that Ameritas' tortious actions allowed Randall to successfully execute his scheme and that Union Central benefitted substantially from its conscious disregard of Randall's fraud:

7

Union Central also played a critical role in the proliferation of Randall's scheme. Randall was able to operate his Ponzi scheme for so long because, as a Union Central general agent, he assembled a team of sub-agents that granted him access to a continuous stream of potential victims. Union Central also cloaked Randall with the imprimatur of legitimacy and respectability that helped him quickly gain the trust and confidence of his Victims. Most important to Randall, however, was Union Central's willful abdication of its duty to supervise him and willingness to turn a blind eye to the obvious indications of Randall's fraud from the very outset of their relationship.

***

Using this illegal sales practice, Randall and HFI quickly became one of Union Central['s] most successful general agencies nationwide. Because Randall was one of its top-producing agents, Union Central made a conscious choice to ignore the indications that its agent was running a fraudulent investment scheme. During Randall's tenure as a Union Central general agent, Union Central collected over *$100 million dollars in premiums* on policies sold by Randall and his sub-agents.

(Exh. 3, ¶¶ 4, 8).

26.     On or about September 10, 2014, Ameritas asked Federal to provide a decision on its insurance claim based upon the information then available to Federal. On October 24, 2014, Federal advised Ameritas that the Bond did not cover its liability to third parties, even if that liability arose from Randall's alleged dishonesty: "As discussed, the Bond does not respond to 3rd Party claims as it is a 1st Party coverage, which only responds to direct losses incurred by Assured. At this time, the Complaint is alleging that Union Central is liable for the acts of its **General Agent,** Randall. The Bond is a contract of indemnity against loss, as opposed to a contract against liability. Liability insurance covers the liability of Union Central to a third party, while the Bond covers the loss resulting directly from dishonest acts of any **General Agent**."  A true and correct copy of Federal's October 24, 2014 letter is attached hereto as Exhibit 4.

27.     Ameritas settled the Miller Lawsuit in 2018.  In exchange for a release of liability, ALIC agreed to pay the Victims PAT $11,250,000. The settlement agreement was executed by ALIC, the same entity involved in *Ameritas I.*  A true and correct copy of the publicly filed

8

motion to approve the settlement, along with settlement agreement, is Exhibit 5.

28.    In addition to the Miller Lawsuit, Randall's bankruptcy trustee filed two adversary proceedings against Ameritas.  True and correct copies of the complaints filed in the adversary proceedings are attached as Exhibits 6 and 7.  Ameritas refers to these cases as the "Renewal Commissions Case" (Adv. No. 13-02023) and the "Claw Back Case" (Adv. No. 12-02385).  Ameritas settled the adversary proceedings for $3,450,000 in April 2018. A true and correct copy of the motion to approve the settlement of the adversary proceedings is attached as Exhibit 8.

29.    Per Ameritas' settlement agreement with the Trustee, the Renewal Commissions Case did not allege that Randall stole from Ameritas, but rather that Ameritas was liable for its failure to remit annual commission payments on renewed life insurance policies sold by Randall and/or HFI to the bankruptcy estate:

> Union Central did not remit any renewal commissions to the Trustee after his appointment and the filing of the Corporate Debtors' bankruptcy cases. Rather, Union Central contended that no renewal commissions were due, or alternatively, that Union Central was entitled to offset or recoupment rights for the full amount of the renewal commissions . . .[T]he Bankruptcy Court entered Judgment . . . in favor of the Trustee and against Union Central in the Renewal Commission Case. Among other things, the Judgment awarded the Trustee and the Consolidated Estate a money judgment . . . in the total amount of $402,286.56, plus interest and costs of suit. The Judgment also ordered and directed Union Central to account for and turn over to the Trustee all renewal commissions that accrue and become due from and after December 1, 2017.

(*In re Randall*, Case No. 10-bk-37546, Dkt. 1675, pg. 20).

30.    The Claw Back Case concerned Ameritas' alleged liability for "insurance premiums and loan repayments" received from Randall and his companies and which the bankruptcy trustee contended were "avoidable and recoverable as fraudulent transfers under Section 548 of the Bankruptcy Code and similar provisions of the Utah Uniform Fraudulent

Transfer Act." (*Id.* at 21). Per the settlement agreement, "Union Central denie[d] that it [wa]s liable for any amounts in the Claw Back Case and it also assert[ed] that, even if it ha[d] some liability, it [wa]s entitled to offset against the Transfers the value it provided . . . The Trustee dispute[d] Union Central's entitlement to a good faith defense." (*Id.*)

31.     Thereafter, on December 19, 2018, Ameritas sent a demand letter to Federal requesting that Federal agree to reimburse it for the amount paid to settle the Miller Lawsuit, its settlement of the two adversary proceedings, and its legal costs incurred defending these matters. Contradicting the decision in *Ameritas I*, Ameritas again asserted that amounts paid to defend and settle its alleged liability in these third-party lawsuits constituted a "direct loss" covered by the Bond.

## OVERVIEW OF BOND PROVISIONS

32.     Federal issued Financial Institution Bond Form C-Life No. 81952300 to Ameritas Holding Company effective January 1, 2014 to January 1, 2015, a true and correct copy of which is attached hereto as Exhibit 1.

33.     Subject to a $10 million Single Loss Limit of Liability and a $500,000 Deductible, Insuring Clause 1.C. of the Bond provides as follows:

> The COMPANY, in consideration of payment of the required premium, and in reliance on the APPLICATION and all other statements made and information furnished to the COMPANY by the ASSURED, and subject to the DECLARATIONS made a part of this Bond and to all other terms and conditions of this Bond, agrees to pay the ASSURED for:
>
> ***Insuring Clauses***
>
> *Dishonesty*
>
>                                          ***
>
> C. General Agent

Loss resulting directly from dishonest acts of any **General Agent,** committed alone on in collusion with others except with a director or trustee of the ASSURED who is not an **Employee,** provided, however, the ASSURED shall first establish that the loss was directly caused by dishonest acts of any **General Agent,** which result in improper personal financial gain to such **General Agent** and which acts were committed with the intent to cause the ASSURED to sustain such loss.

\*\*\*

Notwithstanding the foregoing, when a loss is covered under INSURING CLAUSE 1.C., 1.D., 1.E., or 1.F., and the **General Agent, Soliciting Agent, Third Party Administrator** or **Servicing Contractor** was acting in collusion with others and intended to receive improper personal financial gain, but said **General Agent, Soliciting Agent, Third Party Administrator** or **Servicing Contractor** failed to derive such improper personal financial gain, such loss will nevertheless be covered under this INSURING CLAUSE as if the **General Agent, Soliciting Agent, Third Party Administrator** or **Servicing Contractor** had obtained such improper personal financial gain provided that the ASSURED establishes that the **General Agent, Soliciting Agent, Third Party Administrator** or **Servicing Contractor** intended to receive such improper personal financial gain.

For the purposes of INSURING CLAUSE 1.C., 1.D., 1.E., and 1.F., the term **General Agent, Soliciting Agent, Third Party Administrator** or **Servicing Contractor** shall be deemed to include the partners, officers and employees of such **General Agent, Soliciting Agent, Third Party Administrator** or **Servicing Contractor.** Each **General Agent, Soliciting Agent, Third Party Administrator** or **Servicing Contractor** and its partners, officers, and employees shall collectively be deemed to be one person for the purposes of Section 1, Definitions, u., Single Loss.

34.     Pursuant to Section 2(e), the Bond excludes coverage for "damages of any type for which the ASSURED is legally liable, except compensatory damages, but not multiples thereof, arising from a loss covered under this Bond."

35.     Pursuant to Section 2(f), the Bond excludes coverage for "any costs, fees and expenses incurred by the ASSURED: (1) in establishing the existence of or amount of loss covered under this Bond, or (2) as a party to any legal proceeding, even if such legal proceeding results in a loss covered by this Bond."

36.     Pursuant to Section 2(g), the Bond excludes coverage for "loss resulting from indirect or consequential loss of any nature."

11

37.     Pursuant to Section 2(i), the Bond excludes coverage for

loss, or that part of any loss, resulting solely from any violation by the ASSURED or by any **Employee** or by any **General Agent, Soliciting Agent, Third Party Administrator,** or **Servicing Contractor:**

(1)     of any law regulating:
      i.       the issuance, purchase or sale of securities,
      ii.      securities transactions on security or commodity exchanges or the over the counter market,
      iii.     investment companies,
      iv.      investment advisors,
      v.       insurance companies, or
(2)     of any rule or regulation made pursuant to any such law.

### FEDERAL BEARS NO LIABILITY UNDER THE BOND

38.     Ameritas seeks recovery under the Bond solely because Randall's alleged victims pursued claims against Ameritas, and sought to hold Ameritas liable for damages the investors allegedly sustained.  As in *Ameritas I*, Ameritas did not suffer any loss as a result of Randall's alleged dishonesty until third-party claimants demanded reimbursement and recovery from Ameritas and Ameritas chose to settle its alleged civil liability. Ameritas denied liability and did not sustain any loss until it chose to settle those claims.  Ameritas now demands reimbursement from Federal for amounts paid to settle a civil liability, which is an indirect loss outside the scope of coverage afforded by Insuring Clause 1.

39.     The Bond does not cover Ameritas' alleged liability (even if due to Randall's alleged dishonesty) for any amounts incurred to defend or resolve claims alleging such liability because as *Ameritas I* already concluded, the payment of a liability is not a Loss "resulting 'directly from dishonest acts . . .'"

40.     Ameritas' demand for fees incurred defending tort claims contradicts Exclusion 2.f. which expressly states that the Bond "does not directly or indirectly cover…any costs, fees

and expenses incurred by the ASSURED: (1) in establishing the existence of or amount of loss covered under this Bond, or (2) as a party to any legal proceeding, even if such legal proceeding results in a loss covered by this Bond." Ameritas cannot, therefore, seek recovery of fees, costs, or expenses incurred defending the lawsuits initiated by the third parties allegedly defrauded by Randall.

41.     The claimants also alleged that Ameritas violated various statutes and laws regulating securities sales. Loss resulting from such violations is not covered pursuant to Exclusion 2.i.

42.     Ameritas alleges that it is legally liable to the claimants; however, pursuant to Exclusion 2.e., the Bond precludes recovery for damages for which Ameritas is legally liable, except compensatory damages, but not multiples thereof, arising from a loss covered under the Bond.

## COUNT I: DECLARATORY JUDGMENT

43.     Plaintiff realleges paragraphs 1 through 42 as if set forth fully herein and for paragraph 43 of Count I.

44.     Ameritas alleges a loss covered under Insuring Clause 1, but that insuring clause only covers loss "resulting directly" from a covered peril.

45.     Amounts paid to settle third party claims are not covered under Insuring Clause 1.C because they do not constitute a "Loss resulting directly from dishonest acts of any **General Agent**, committed alone or in collusion with others except with a director or trustee of the ASSURED who is not an **Employee** . . ."

46.     In addition, the Bond expressly excludes coverage for indirect loss. Pursuant to Exclusion 2.e., the Bond "does not directly or indirectly cover . . . damages of any type for which

the ASSURED is legally liable, except compensatory damages, but not multiples thereof, arising from a loss covered under the Bond." The claimants alleged that Ameritas was legally liable to the Victims PAT and bankruptcy estate; however, the Bond precludes coverage for amounts incurred to defend and settle civil liability, even if Ameritas incurred the alleged civil liability due to alleged employee dishonesty.

47.     Although this Court's decision in *Ameritas I* and Nebraska Supreme Court precedent support Federal's analysis and denial of coverage, Ameritas continues to demand reimbursement, thereby creating a genuine disagreement ripe for resolution through this declaratory judgment action.

48.     Insuring Clause 1.C. and the above-cited exclusions, in whole or in part, preclude coverage for Ameritas' claim under the Bond.

WHEREFORE, Federal Insurance Company prays that this Honorable Court finds and declares the rights and duties of the parties, specifically finds and declares that Defendants cannot recover amounts incurred settling claims alleging or arising from Randall's alleged dishonesty under the Bond, and for any other relief the Court deems necessary and appropriate.

### COUNT II: DECLARATORY JUDGMENT

49.     Plaintiff realleges paragraphs 1 through and including 42 as if set forth fully herein and for paragraph 49 of Count II.

50.     Pursuant to Exclusion 2.f., the Bond "does not directly or indirectly cover…any costs, fees and expenses incurred by the ASSURED: (1) in establishing the existence of or amount of loss covered under this Bond, or (2) as a party to any legal proceeding, even if such legal proceeding results in a loss covered by this Bond."

51.     Applying this exclusion, Ameritas cannot recover fees, costs, or expenses

incurred defending the third-party claims.

52.     Ameritas nonetheless demands reimbursement of amounts incurred defending claims arising from Randall's alleged dishonesty, thereby creating a genuine disagreement ripe for resolution through this declaratory judgment action.

WHEREFORE, Federal Insurance Company prays that this Honorable Court finds and declares the rights and duties of the parties, and specifically finds and declares that Federal is not liable under the Bond for costs, fees and expenses incurred defending and settling any claims alleging or arising from Randall's alleged dishonesty.

## COUNT III: DECLARATORY JUDGMENT

53.     Plaintiff realleges paragraphs 1 through and including 42 as if set forth fully herein and for paragraph 53 of Count III.

54.     Pursuant to Exclusion 2.i., the Bond:

does not directly or indirectly cover…loss resulting from any violation by the ASSURED or by any Employee or by any General Agent, Soliciting Agent, Third Party Administrator, or Servicing Contractor: (1) of any law regulating: i. the issuance, purchase or sale of securities, ii. securities transactions on security or commodity exchanges or the over the counter market, iii. investment companies, iv. investment advisors, v. insurance companies, or (2) of any rule or regulation made pursuant to any such law.

55.     The Trustee alleged that Ameritas, Randall and/or the Horizon Group violated various statutes and laws regulating securities sales. Any loss resulting from such violations is not covered under the Bond.

56.     This exclusion, in whole or in part, precludes Ameritas' claim under the Bond. Ameritas disagrees with Federal's conclusion thereby creating a genuine disagreement ripe for resolution through this declaratory judgment action.

WHEREFORE, Federal Insurance Company prays that this Honorable Court finds and

declares the rights and duties of the parties, specifically finds and declares that Defendants' claim under the Bond is not covered, and for any other relief the Court deems necessary and appropriate.

Dated: April 16, 2019

**GORDON REES**
**SCULLY MANSUKHANI, LLP**

*s/ A. Victor Rawl, Jr.*
A. Victor Rawl Jr.
1299 Farnam Street, Suite 300
Omaha, NE 68102
(843) 714-2501
vrawl@grsm.com

Scott L. Schmookler
(*pro hac vice* application forthcoming)
Katherine A. Musbach
(*pro hac vice* application forthcoming)
1 N. Franklin
Suite 800
Chicago, IL 60606
(312) 980-6779
(312) 980-6798
sschmookler@grsm.com
kmusbach@grsm.com

*Attorneys for Plaintiff,*
*Federal Insurance Company*